31780.  PRUDENTIAL INSURANCE COMPANY OF
AMERICA *v.* McLELLAN.

Decided November 8, 1947.

*Reese, Bennet & Gilbert, J. H. Highsmith,* for plaintiff in error.
*J. B. Moore, Andrew J. Tuten, Milton C. Grainger,* contra.

Felton, J.  The only question for determination in this case is whether there was sufficient evidence to authorize the finding that the insured's death was accidental within the meaning of the policy.  It was admitted that the death resulted "directly and independently of all other causes and from bodily injuries effected solely through external, violent . . means," and the face amount of the policy had been paid to the plaintiff.  Briefly the evidence shows that on the evening of the death of the assured, he had gone, after having had a few drinks earlier, in company with some friends, to a night club, known as the "Star Grill," on the outskirts of the town of Baxley.  While they were there someone telephoned a request to the police to come there and quell a disturbance.  City police officers Harris and Weaver responded to the call and upon arrival Harris entered the estab-

lishment and an altercation ensued which resulted in Harris' being severely battered about the head and in McLellan's being shot through the buttocks. Harris was unassisted by officer Weaver and being the conquered rather than the conqueror was forced to flee. McLellan was taken to the offices of Dr. Holt in Baxley. Harris sought the aid of the sheriff of the county and Deputy Sheriff Davis was assigned to assist Harris in completing his attempted arrest of McLellan. These officers discovered McLellan in the offices of Dr. Holt, where, upon entering the office, another altercation took place and resulted in Davis' firing two fatal bullets into McLellan. There is no dispute that Harris did not have a warrant for the arrest of Mc-Lellan. He admitted that he did not. The record resounds with conflicting evidence, however, upon the other issues involved. George Aycock, a member of McLellan's party at the night club testified: "I was present when Officer Harris came into the 'Star Grill'. At that time John McLellan was drinking a cup of coffee and eating a sandwich—sitting on a stool at the counter, like. When Harris came in McLellan says, 'Well, I reckon they came after me,' and I said to him, 'No, I don't think that they came after you, John.' He says, 'Well, if they come after me they just as well carry me on in,' and Harris stepped up there and John says, 'Come on have a cup of coffee' . . and Harris stepped up and pulled out a blackjack and said, 'No, I don't want to have to lock you boys up tonight,' and jerked out his blackjack and they went together, and they run against the wall, like, and John grabbed him and fell to the floor and John was on top, and John took his blackjack away from him and struck him over the head with it a few licks, and Harris had got hold of his pistol and he fired two shots with it, and the pistol hit the floor and I picked it up and throwed it on the outside out there. And Harris finally got loose from John and got up and run and went out." Officer Harris testified that he received a call to come to the "Star Grill" on the night of McLellan's death to put down a disturbance there, and when he arrived at the Grill "there was a large sized window in it and when I drove up I seen there was a good many people in there, so I stopped and set in the car about two or three minutes to see what was going on. Well, I couldn't tell much about it. They looked like they were

pretty noisy in there, so I got out and opened the door and walked in, and everything quietened off. I asked Barney Griffis, was the fellow, that run the place. I says, 'Barney, did you call me?' Well, he didn't answer me. I think he shook his head. I won't say for sure whether he shook his head or not. Well, when he done that, there was a marble table, a pin ball machine, over to the right .and I walked over there and propped up on the table just like that, and there was first one word and then another spoke, and then it all started. This fellow McLellan got to cursing and raising cain and I walked over to him and said, 'Fellow, you are going to have to quieten off.' I says, 'You are in a public place.' Well, he didn't pay me any attention. And I told him a second time, 'If you don't quieten off I will have to carry you with me.' Well, he didn't pay me any attention, and I touched him by the arm and says, 'Come on,' and he whirled around and hit me, and I snatched out my blackjack and I never got the blackjack over that far before a Martin boy grabbed it by the strop and was jerking the blackjack, and I turned it loose, and I hit him, McLellan, with my fist, and he went in between the stools and I went in on top of him and I had him. He couldn't move, and by the time we got on the floor and I got him under control there was a good many went to frailing me with bottles and blackjacks. There was six or seven or eight. . . They were trying to beat me to death." The second act of the tragedy was staged in the office of Dr. Holt and here again the versions of what occurred are varied and conflicting. The plaintiff testified that she had been notified to come to Dr. Holt's office as her husband had been shot. She testified that she entered the office with Deputy Sheriff Davis and Officer Harris: "I went in Dr. Holt's office. Mr. Davis went in right from the side. Just as we were entering I heard somebody say to John, 'John, there's your wife,' and by the time I got in he must have been coming meeting me, and Mr. Davis was still by my side. We went into Dr. Holt's office and I met John in the door, and I says, 'John, what in the world.' And he said, 'I have been shot,' and by that time I noticed by my side that there was a shotgun, and Harris was directly behind me with that gun. He was behind me and the shotgun barrel was right by my side. He had not left the shotgun out-

side as Mr. Davis had directed him to do. When John saw the gun he made a pass for it with his right hand that way, and as he made the pass Harris dropped the gun and it went on the floor by my side, and there were some licks passed over my head. I don't know which one made them, but I was struck, I was struck on the arm and John took his right hand and shoved me aside so he could get to Harris, I guess, and just as he shoved me aside Mr. Davis was right by both our sides, and he grabbed John in a clinch and they both grabbed each other that way and went down to the floor. My husband never had his hands on the shotgun. If he ever touched it I didn't see him. He couldn't have touched it unless it was while they were in the scuffle on the floor, maybe—just brushed it or something. I was in the room that it all occurred in and when my husband was shot. John McLellan never pointed this shotgun at either Policeman Harris or Deputy Sheriff Harris, or any other person. He never had the gun in his hand. Policeman Harris rushed in with this shotgun in his hands and my husband did grab for the shotgun. He made a pass for it, but he didn't get hold of it, and Harris dropped it to the floor. Policeman Harris did not remain in the room. He left just as soon as my husband grabbed for the gun and run. When the gun dropped to the floor Mr. Davis grabbed my husband, John, and they clinched and went to the floor together. They both went down in a clinch and Harris dropped the gun in the scuffle and the gun got pushed aside by the door that he was coming out of behind towards the door back over to the right where they went down. Officer Harris was gone at this time. While my husband and Deputy Sheriff Davis were clinched together, John said to him, 'I. J., I don't want to hurt you.' And about that time Davis jumped up and jumped back almost against me. My husband seemed to have released his grip on Davis because he said, 'I. J., I don't want to hurt you,' and by that time Davis jumped up. John was trying to get himself up and he was holding himself somewhat like this coming up, and it looked like he couldn't hardly get himself up. He was some four or five feet, I would imagine it was the length of the desk, anyway, from the shotgun. He had one hand on his stomach. At this time he was attempting to straighten up. He had got his knees up from the floor and he was just gradually

trying to get himself up. Davis grabbed his gun out of his holster, and when he grabbed it, I hollered, 'Mr. Davis, don't do that,' and by that time John raised his head to see what was going on, and just as he did he was shot twice by Mr. Davis just as quick as he could. My husband was some four or five feet from the shotgun when he was shot." The plaintiff also testified that George Aycock was present during the shooting. All of the defendant's witnesses testified that they did not see him. Aycock's testimony corroborated in all material details that of the plaintiff with regard to the occurrence at the doctor's office. Miss Willoughby, Dr. Holt's nurse, testified that she lived in the building in which Dr. Holt's offices were located and that hearing the commotion she ran to the offices and as she approached the entrance to the offices she heard Mr. Davis say, 'Drop that gun, John,' or 'Put down that gun, John.' She testified that she did not see Mrs. McLellan when she entered the office after the shooting when she ran through the room to an adjoining room to which Dr. Holt had gone and where he had been lighting a stove. Mrs. McLellan, being recalled, countered this testimony with hers that she saw Miss Willoughby come staggering through the room as though she were drunk. Harris, the police officer, testified that when he entered Dr. Holt's office that McLellan made a lunge for the gun and wrung it from his hands, that he, Harris, ran, and as "I dashed out of the office I heard Mr. Davis say, John, don't do that. Don't do that.' He says, 'put down that gun,' and I went on out to keep from being shot, and that's as much as I know about it." Deputy Sheriff Davis testified that he had been requested by the sheriff, who was abed ill, to assist Harris in arresting McLellan. He testified: "When I first saw John McLellan on that night I had walked through the entrance room and gone into the doctor's office, the middle office, and got just a short ways in the small room, John cursed . . and he came with his fist up this way, and it was so close to me I thought he was going to hit me, and I dodged sideways, and before I could turn around good they were together, Junior Harris and John McLellan, and when I discovered John he was kind of in a crouched position and rising with the shotgun in his hands this way, and I reached over and grabbed the shotgun that way and we went down to the floor,

in the doctor's office, the middle office, and there was a lot of people around when that started, but time we raised up and time we separated there wasn't anybody there, nobody there to help me at all, policeman or nobody else; but as we raised up he drew me this way. When he threw his arm and broke this hold he threw his right arm around my hip and attempted, it seemed to me, to throw me. I was at his back and he got his arm around here, this way, and then I shoved him, and I told him when I grabbed him to give me the gun, and when I shoved him apart and we went over there I told him to drop that gun, and I know he could have heard it, and he had the gun in this position, as he was kind of raising it up, and he changed it to this position and was coming around when I shot him." In his testimony Mann Carter testified: "I saw Officer Harris when he obtained possession of this shotgun. He got the shotgun out of the back of Lannie Taylor's car. He got the gun out of the car and about that time Mr. Davis walked up, and Mr. Davis—Asked Mr. Davis was he ready, and he told him yes. Well, Harris says, 'Well, let's go. I am going to get him, by God, dead or alive.' He says, 'I'm going to arrest him, by God, dead or alive.' That was when he got the gun." Dr. Holt testified that he dressed McLellan's wounds and that he did not ask the officers to come to his office to arrest McLellan; that McLellan was not drunk so far as he could tell, but was extremely angry and that from the conversation with his friends, it appeared that they were going out to look for Harris. Dr. Holt did not see the shooting as he was lighting a stove in the next room at the time.

As to the first encounter, there was evidence that McLellan was and evidence that he was not disturbing the peace such as to warrant Harris' attempt to arrest him. There was evidence to warrant the finding that McLellan used only such force as was necessary to repel the attempt and evidence that the force used was excessive. There was evidence that McLellan was the aggressor and evidence that Harris was the aggressor. When the action recommenced at the doctor's offices, it is undisputed that McLellan lunged forward in an effort to wrest the shotgun from Harris as Harris entered the office. Since the jury was authorized to find that Harris was illegally attempting to arrest McLellan and the facts show that in his attempted arrest Harris

had fired upon and wounded McLellan, it was also a question for the jury whether or not McLellan's action in lunging for the gun was a revengeful act of aggression on the part of McLellan or whether it was done in an effort to defend his life, believing that Harris was maliciously attempting to arrest him without cause and that Harris intended to fire upon him as he had done before at the "Star Grill." It was further a question for the jury's determination whether or not Davis fired upon and killed McLellan in cold blood without justifiable cause or whether he did so believing him to be in the act of shooting him. It was likewise a question for the jury whether or not McLellan had the shotgun in his hands at the time of his death, whether or not he was pointing it at Davis, and whether or not, if he did not have the gun, he was attempting to obtain it for the purpose of shooting Davis or Harris.

The courts have repeatedly stated the rule that in order for an act resulting in death to be accidental within the terms of accident policies that the act causing the death must have been unforeseen, unexpected, or unusual. *Atlanta Accident Asso.* v. *Alexander*, 104 *Ga.* 709 (30 S. E. 939, 42 L. R. A. 188) ; *Johnson* v. *AEtna Life Ins. Co.*, 24 *Ga. App.* 431 (101 S. E. 134) ; *Fulton* v. *Metropolitan Casualty Ins. Co.*, 19 *Ga. App.* 127 (91 S. E. 228) ; *American National Ins. Co.* v. *Chappelear*, 51 *Ga. App.* 826 (181 S. E. 808). Under the facts of this case it was for the jury to decide whether or not the insured should have foreseen that this action, under the circumstances, would reasonably result in his being fired upon and killed.

The jury resolved these issues in favor of the plaintiff beneficiary and since there was sufficient evidence to authorize the finding in her favor, the court did not err in overruling the motion for a new trial.

*Judgment affirmed. Sutton, C. J., and Parker, J., concur.*